IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DAN EOFF                                                      PLAINTIFF/
                                                    COUNTER-DEFENDANT

v.                          No. 4:13-cv-368-DPM

ENVIRONMENTAL PROTECTION AGENCY
and GINA MCCARTHY, in her official capacity as
Administrator of the EPA                                    DEFENDANTS/
                                                    COUNTER-PLAINTIFFS

ORDER

**1.** The question presented is whether the Corps of Engineers and the Environmental Protection Agency unreasonably asserted Clean Water Act jurisdiction over a creek in Van Buren County, Arkansas. Branch Hollow is near Clinton. As its name implies, it's a hollow in the hills with a branch — a sometime creek — at the bottom. The creek emptied into the South Fork of the Little Red River, which isn't navigable at that point, but becomes so several miles downstream, and eventually flows into Greers Ferry Lake. Dan Eoff built a dam across the creek and made a pond on his cattle ranch in the hollow. He didn't wait for the Corps to act on his then-pending application for a § 404(b) permit to put fill in a water of the United States.

The Corps investigated and concluded that it had jurisdiction. The EPA eventually issued an administrative compliance order requiring Eoff to remove the earthen dam, and restore the creek's channel, or pay substantial potential penalties. Eoff responded with this suit challenging that order and the United States' assertion of regulatory jurisdiction. He now seeks judgment as a matter of law on the administrative record. The Court must decide if the Corps' and the EPA's exercise of jurisdiction over the creek in Branch Hollow was arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A).

**2.** Eoff wanted to build a pond on his property, which straddles the South Fork of the Little Red River. This is a ranch: he raises cattle and other livestock. Every year he also hosts the National Championship Chuckwagon Races there. AR-119. Eoff has had dealings through the years with the Corps, the EPA, and other regulatory agencies about what he could and couldn't do on his property. There's been contention. Eoff has some experience with the Clean Water Act's reach; and it appears that some of the agencies, in particular the U.S. Fish and Wildlife Service, were keeping a weather eye on his activities involving the South Fork.

Eoff applied with the Corps in March 2012 for a permit to build an earthen dam 24' tall, 200' wide, and 300' long to create the pond. AR-239-40. His map shows that the dam would be situated where a creek—the "McKnight Branch"—entered the South Fork. The Corps didn't act immediately; it requested more information. Eoff sent back a map, which showed the dam's location and the pond's footprint. AR-236-37. Eoff thought he'd answered the Corps' questions. The EPA argues now that the Corps officer didn't think so. *№ 52 at 8-9.* The record is clear, though, that the permit application stalled. In summer of 2012, and without a permit, Eoff cleared part of the hollow and built his pond, including the dam.

Neighbors or the USF&W tipped off the Corps. In response, the Corps sent a biologist-engineer team to investigate whether Eoff had polluted a water of the United States. The team looked at four areas, including the pond. At the mouth of the hollow, where the creek had emptied into the South Fork, the team encountered a dam 35' tall and approximately 350' long. The water Eoff's dam would trap, the team estimated, would cover ten surface acres. AR-198. According to the Corps' calculation, Eoff had filled in approximately 1,200 linear feet of the stream channel. AR-148. It's unclear how this fill

-3-

volume was calculated. Despite a severe drought that summer, some water had pooled just inside the dam. AR-152 (Photograph 8). Farther upstream, the team described the creek as "meandering" as it ". . . flows through a large wooded area which is mostly undisturbed." AR-191–92. The creek, the team added, "appears to have good water quality through this region with no known pollutants." AR-192. The creek's channel averaged 10' wide and 2' deep, had an ordinary high-water mark, and had well-defined bed and banks. AR-191. The team also consulted United States Geological Survey maps, which traced the branch with a dashed blue line across Eoff's property and into the South Fork. AR-263–64.

Based on the team's findings, the Corps concluded that the creek was a relatively permanent stream, which flowed into the South Fork. The Corps also concluded that Eoff had violated the Clean Water Act by building his dam without a permit. The Corps then turned the case over to the EPA for enforcement proceedings.

**3.** Congress enacted the Clean Water Act more than forty years ago to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits, with various

permitted exceptions, polluting navigable waters. 33 U.S.C. §§ 1311(a) & 1362(12). The dirt Eoff used to build the dam for his pond counts as pollution, but it's also within an exception for fill, which can be put in a covered water with a permit from the Corps. 33 U.S.C. § 1344.

"The term 'navigable waters' means the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Corps and the EPA have, by regulation, defined "waters of the United States" broadly. 33 C.F.R. § 328.3 & 40 C.F.R. § 232.2. Those waters include "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters: (i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or (ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or (iii) Which are used or could be used for industrial purpose by industries in interstate commerce[.]" 33 C.F.R. § 328.3(a)(3). Covered waters also include "tributaries" of waters of the United States. 33 C.F.R. § 328.3(a)(5). The regulation doesn't explain what is

or is not a tributary. The EPA has said informally that a non-navigable tributary is "a non-navigable water body whose waters flow into a traditional navigable water either directly or indirectly by means of other tributaries." *No. 54-1 at 6*. This definition is both vague and sweeping.

In a sense, this case is about a tributary of a tributary. It's undisputed that the South Fork of the Little Red becomes navigable between 2 and 5 miles downstream from Eoff's pond, and thus is covered—at that point—by the Clean Water Act. And it seems beyond serious argument that, where there's continuous and connected flow upstream from where the stream becomes navigable, the upper South Fork is a tributary of a navigable water. The dispute is whether the United States' jurisdiction extends to a creek, like the one in Branch Hollow, that feeds into the non-navigable upper South Fork.

Some history in broad strokes for context. In the four decades since Congress passed the Act, the Corps and the EPA have, through regulation and regulatory action, pursued an expansive understanding of their Clean Water Act jurisdiction. While initially receptive, more recently the Supreme Court has rejected the agencies' assertion of sweeping jurisdiction. In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139 (1985), the Court held

that wetlands adjacent to navigable waters were waters of the United States subject to regulation. Because where the water ended and the land began was a question of degree, the Corps and the EPA could regulate these wetlands under the Act. But in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 166 (2001), the Court rejected the Corps' jurisdiction over ponds in an abandoned sand-and-gravel mine. Migratory birds used the ponds as a habitat. These "non-navigable, isolated, intrastate waters" were beyond the statute's reach; therefore, the regulation purporting to cover them was invalid. *Ibid.* And in *Rapanos v. United States*, 547 U.S. 715 (2006), the Court rejected the Corps' assertion of jurisdiction over wetlands connected with navigable waters by ditches and drains whose flow was uncertain. The Court was divided in its reasoning. The four-justice plurality concluded that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Rapanos*, 547 U.S. at 742 (emphasis original). Justice Kennedy provided the fifth vote to reject the Corps' position. He concluded that the Act embraced a wetland with "a significant nexus" to a

navigable water. *Rapanos*, 547 U.S. at 767 (Kennedy, J., concurring). The four dissenting justices concluded that, applying *Riverside Bayview*, the Corps had jurisdiction. 547 U.S. at 787–88. In response to *Rapanos*, the Corps and the EPA have proposed revised regulations. Definition of "Waters of the United States," 79 Fed. Reg. 22188 (21 April 2014) (to be codified at 33 C.F.R., pt. 328). So the conversation goes on.

The parties argue this case using the *Rapanos* plurality's standard. The Court of Appeals hasn't yet spoken about the issue presented. Its two post-*Rapanos* decisions are about wetlands where no tributary or flow issue was involved. *Hawkes Co., Inc. v. United States Army Corps of Engineers*, 782 F.3d 994 (8th Cir. 2015); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). Eoff points to *Benjamin v. Douglas Ridge Rifle Club*, 673 F. Supp. 2d 1210, 1215–17 (D. Or. 2009), which is helpful, but other precedent is sparse. This Court agrees with the parties: the *Rapanos* plurality's holding about what kind of channel qualifies as covered water, as well as the plurality's discussion about varying flow, is the best indication of what the law is on tributaries.

Justice Kennedy offered a looser standard on flow, while also criticizing the breadth of the Corps' definition of a tributary. *Rapanos*, 547 U.S. at 770 &

781. A case involving what he called "irregular waterways," including "impermanent streams," would require harmonizing the *Rapanos* plurality and the concurrence on this point. The Court would have to discern the narrowest common ground. *Marks v. United States*, 430 U.S. 188, 193 (1977). Here, though, the EPA agrees to the application of the plurality's stricter standard. № *52 at 6*.

"In sum, on its only plausible interpretation, the phrase 'waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.' See Webster's Second 2882. The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Rapanos*, 547 U.S. at 739. Neither "streams . . . that might dry up in extraordinary circumstances, such as drought[,]" nor "*seasonal* rivers, which contain continuous flow during some months of the year but no flow during dry months . . . [,]" are necessarily excluded. *Rapanos*, 547 U.S. at 732 n.5 (emphasis original). "Common sense and common usage distinguish between a wash and seasonal river." *Ibid.*

**4.** The creek in Branch Hollow, the Corps found, was a relatively permanent stream that flowed into the South Fork, a tributary of a traditional navigable water. The Corps therefore concluded that its Clean Water Act jurisdiction covered the creek. That conclusion was not arbitrary, capricious, or contrary to law. 5 U.S.C. § 706(2)(A).

Several facts support the Corps' conclusion that this creek was a relatively permanent body of water. First, the United States Geological Survey maps showed the creek flowing directly into the South Fork. One of those maps was from 1982. AR-263. Twenty-nine years later, the creek in Branch Hollow was still on the USGS map. AR-264. Second, Eoff's own map showed that he planned to dam a creek. AR-241. Third, during a period of severe drought, water had begun pooling at the base of Eoff's dam. Fourth, farther upstream of the dam, the creek flowed uninterrupted in a well-defined channel, meandering through the woods. AR-191–92. Last, there was a continuous surface connection between the creek and the South Fork, with an estimated twenty plus "flow events" each year. AR-191. Though Eoff doesn't press this point, one might well say that approximately twenty flows of water doesn't sound characteristic of a relatively permanent water. But the Court

must view the administrative record as a whole in the light most favorable to the Corps' conclusion. *Friends of the Norbeck v. United States Forest Service*, 661 F.3d 969, 975–76 (8th Cir. 2011). The Corps' estimate of "flow events" supports the conclusion that this creek flowed, though with varying volume, throughout the year.

It's true, of course, that no creek is visible in the photographs taken at the base of the dam. AR-204. It's undisputed, however, that Eoff filled in some of the creek's channel before the Corps inspected the dam site. The Corps could inspect only what it found. And what it found supports classifying this creek as a water of the United States. The conclusion, at least, doesn't defy common sense. The creek in Branch Hollow is more than a wash or a gully. It is stream enough to be covered by the Act.

But the conclusion that this creek is a water of the United States doesn't necessarily mean that Eoff needed a permit before building his dam. If done "for the purpose of construct[ing] . . . stock ponds[,]" putting fill into a navigable water is exempt from the Act's permit requirement. 33 U.S.C. § 1344(f)(1)(C). An exception to this exemption, however, recaptures fill material put "into the navigable waters incidental to any activity having as its

purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced[.]" 33 U.S.C. § 1344(f)(2). Eoff must show two things here—he qualifies for the stock-pond exemption, and his pond escapes the recapture provision. *U.S. v. Cundiff*, 555 F.3d 200, 214 (6th Cir. 2009); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 955 (7th Cir. 2004).

Although he didn't refer specifically to this exemption, Eoff wrote in his application that he wanted to build a pond to water his cattle, in case his pasture had to be "fence[d] off River." AR-240. The administrative record contains the C.F.R. provisions about stock ponds, with some handwritten marks; so it appears that someone at the Corps considered the exemption. AR-234. The Corps, however, never said one way or the other whether the exemption applied. The parties dispute this point. Eoff argues that he's using the pond to water his cattle and that there's no evidence to the contrary. The Corps counters that there's also no evidence that he *is* using the pond for livestock. What's more, the Corps notes, the pond may have a dual purpose. Some of the impoundment was going to cover a neighbor's property. That

neighbor, Eoff told the inspection team, planned to sell some of the water for use in hydraulic fracturing. On this murky record, Eoff simply hasn't carried his burden of showing that the stock-pond exemption applies. *Cundiff*, 555 F.3d at 214.

The lack of evidence here is probably because the Corps didn't act on Eoff's application until after the dam was built. Recall that the EPA argues that the application was incomplete. *№ 52 at 8–9*. That's incorrect. The Corps asked Eoff for a map of the proposed dam with a footprint of the pond. AR-237. Eoff provided one. AR-236. The Corps should have moved the process along then. But Eoff's dissatisfaction with a slow-moving bureaucracy doesn't excuse his building the dam without getting a final word from the Corps. He could have sued to compel the Corps to act. 5 U.S.C. § 706(1); *see, e.g., Brock v. Pierce County*, 476 U.S. 253, 260 & n.7 (1986).

This is not the end of the stock-pond exemption's potential work in this case, though. Eoff also pleaded the Clean Water Act exemptions as affirmative defenses to the Corps' counterclaim. *№ 15 at 9*. The Court's holding that Eoff isn't entitled to judgment as a matter of law about the stock-pond exemption on the administrative record is without prejudice to Eoff proving this

exemption as an affirmative defense.

\* \* \*

Eoff's motion for judgment, № 47, is denied. The Corps requests a deadline for a motion seeking judgment on the pleadings on Eoff's remaining constitutional claims. *№ 52 at 1–2 n.1.* That deadline is 19 June 2015.

So Ordered.

*/s/ DPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

19 May 2015